**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

THREE RIVERS RESORT, INC., and     :
WILDERNESS TRAILS, INC., individually   :
and on behalf of all others similarly situated,  :
    :
    Plaintiffs,     :      Case No. 1:17-cv-06005
    :
v.     :
    :
FIRST DATA CORPORATION, a Delaware  :
corporation doing business as FIRST DATA  :      **Jury Trial Demanded**
GLOBAL LEASING,     :
    :
    Defendant.     :

------------------------------------------------------------x

## CLASS ACTION COMPLAINT

Plaintiffs Three Rivers Resort, Inc. and Wilderness Trails, Inc., individually and on behalf of the class of persons and entities preliminarily defined below, complain and allege as follows, based on personal knowledge, investigation of counsel, and information and belief:

## INTRODUCTION

1.     This is a civil action seeking monetary damages and declaratory and injunctive relief against First Data Corporation and its affiliate First Data Global Leasing ("FDGL"). Collectively these entities are referred to hereinafter as "First Data" or "Defendant." There are likely other First Data subsidiaries and affiliates involved but Defendant uses hundreds of corporate entities in an intricate shell game to avoid transparency and accountability. Discovery will be needed to confirm all of the culpable affiliates of First Data.

2.     This case seeks reimbursement for all victims of First Data's assessment of improper and excessive termination fees based on point of sale ("POS") equipment leases. Such equipment, including payment terminals, card readers, and mobile payment devices, is used to

accept credit and debit card payments.  In addition to reimbursement, this action seeks to put an end to Defendant's ongoing scheme to cheat its customers.

3.      This case seeks relief based upon Defendant's breaches of contract, violations of applicable New York law, failure to adhere to New York's adopted version of the Uniform Commercial Code, and – in the alternative to breach of contract – unjust enrichment.

4.      In today's business world, nearly all merchants must accept credit and debit cards to survive in any marketplace.  In fact, most merchants receive the majority of their revenue through card payments.  As used throughout this Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit cards for payments.  This includes individuals, non-profits, schools, churches, government agencies, and many persons or entities that are not traditional businesses.  All are subject to the same abusive treatment by Defendant.

5.      With the days of punching carbon copies behind them, most merchants must use POS equipment to process and receive funds customers pay merchants using credit or debit cards.  Unfortunately, the business practices of First Data often lead to merchants entering complex agreements involving several parties just to lease a POS terminal which could simply be purchased for less than $200.

6.      Merchants are pushed to lease POS equipment from FDGL at the time they enter into payment processing agreements with banks and processors.  The banks and processors serve as First Data's agents in the POS terminal leasing transaction.  Examples of such agents are Wells Fargo Merchant Services and Wells Fargo Bank, both of which actively push FDGL's POS terminal leases on customers.  In return for signing up customers to these extremely profitable leases, these agents can earn one-time payments of over $1000.  FDGL's true identity

and role in this scheme is not fully explained by First Data's agents and the form contracts are intentionally cryptic and inherently contradictory.

7.      FDGL's sole purpose in this scheme is to make scandalously high profits by tricking customers into leasing equipment that costs less than $200 for thousands of dollars.  In order to make such returns, FDGL binds merchants to non-cancelable agreements for the lease of POS terminals over a period of years.  For example, a common scenario would be leasing a POS terminal for $40 per month for 48 months which, when various junk fees are added by FDGL, will pay Defendant well over 10 times the cost of the equipment.  No customer would ever knowingly and intentionally enter such a lease, but the lease transaction is buried as part of the payment processing agreement which merchants are led to believe is a package deal.  In other words, First Data's agents depict the terminal lease as a necessary part of the card processing arrangement, though merchants are actually free to buy the necessary equipment wherever they choose, including online where it can readily be found for $50-$250, depending on the type of equipment.

8.      This general practice of First Data and its agents – which can be summarized as misleading merchants into signing equipment leases which they would never agree to if they understood the actual terms – is not the one challenged in this case.  Such a case would undoubtedly be important and meritorious, but this case is narrower.  This suit takes on only First Data's imposition of improper fees when customers terminate their relationship with Defendant.

9.      Astronomical profits in its POS equipment leasing program do not satisfy First Data – Defendant also cheats customers trying to get out of the leases and it does so in several ways.  First Data's methods violate the plain contractual terms and the applicable New York law.

3

Defendant utilizes threats of legal action and collections to induce customers to pay exorbitant fees which cannot be substantiated by law, fact, or contract.

## THE PARTIES

10.     Plaintiffs Three Rivers Resort, Inc. and Wilderness Trails, Inc. d/b/a Three Rivers Rafting (collectively, "Three Rivers") are Idaho corporations located in Lowell, Idaho.  Plaintiffs are under common ownership and management and in many ways function like one business. Therefore the term "Plaintiff" is utilized hereinafter to refer to them both.  Three Rivers is a family-owned business that has offered guided river trips on local rivers and log cabin rentals on its property for decades.

11.     Defendant First Data Corporation is a Delaware corporation with its principal place of business in Atlanta, Georgia.  First Data Corporation primarily generates revenue by charging fees for processing credit card transactions.  According to First Data's most recent annual report to the United States Securities and Exchange Commission ("SEC report"), its payment volume accounted for over 10 percent of the United States gross domestic product in 2016.  First Data Corporation does business under countless shell companies and entities.  In its effort to shield itself from liability, Defendant makes it very difficult to ascertain which of its subsidiaries are responsible for specific operations.  Discovery may show more subsidiaries responsible for and relevant to the conduct alleged herein.

12.     First Data Global Leasing is a segment of First Data Corporation responsible for leasing equipment and charging lease payments.  FDGL is the arm of the company which is generally listed by First Data as the equipment lessor and which automatically deducts monthly lease payments from customers' bank accounts.  In First Data correspondence, Three Rivers was welcomed as a "FDGL customer" and notified that "FDGL" would appear on bank statements

when charges were deducted from Three River's checking account.  "FDGL" does appear on Three River's checking account statements for each month of the leases described herein. Strangely, for an entity that does enormous business in New York and all other states, FDGL is not registered to do business in New York or the other states.  Further, FDGL – despite having hundreds of millions of dollars in annual revenue – is effectively shielded from view in First Data's financial reports to the Securities and Exchange Commission.  Thus, Plaintiff cannot confirm FDGL's business status or determine which of First Data's shell corporations it operates under.

## JURISDICTION AND VENUE

13.     First Data requires customers all over the country – including individuals, small businesses, churches, and non-profits – to sue it in Suffolk County, New York.  Three Rivers could never justify the expense of suing Defendant in New York but for this case being a class action, which allows legal fees and costs to be spread across the thousands of victims of First Data's practices.

14.     Jurisdiction is proper in federal court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than New York.

15.     This Court has personal jurisdiction over First Data because it is engaged in a continuous and systematic course of doing business in New York by offering its services to thousands of New York customers.

16.     Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendant has an office here and conducts substantial business in this district.  Moreover, Defendant's form

contract with Plaintiff and the members of the proposed class specifies that all cases must be filed in the courts of Suffolk County, New York.  Plaintiff would have sued in Idaho (where Plaintiff is located) or Georgia (where First Data is headquartered) had it been allowed to do so.

## FACTUAL ALLEGATIONS

### A.  First Data Misleads Merchants by Misrepresenting the Nature of Agreements Through its Agents and Form Contracts

17.  First Data is a multi-national corporation with several segment corporations and unincorporated business arms.  This case focuses on First Data's leasing business.  First Data is not a finance company, such as a disinterested third party lender that finances the purchase or lease of equipment.  First Data does far more than merely finance a purchase and lease the POS equipment provided to the merchant.  Instead, First Data seeks to be involved in all elements of the payment processing business and to maximize its profits off merchants through all available channels.

18.  First Data manufactures POS terminals or brands POS terminals manufactured by other corporations to sell and lease the equipment to merchants.  In First Data's 2017 SEC reporting, First Data Global Business Solutions ("GBS") is identified as Defendant's arm responsible for operations related to equipment.  Beyond this, it is unclear what role GBS plays or has played in Defendant's business.  Defendant has also listed its subsidiary First Data Merchant Services as responsible for equipment leases in other official reports.

19.  At all times relevant to this Class Action Complaint, First Data has been fully aware of the manufacturing costs, acquisition costs, retail costs, and leasing costs offered to and paid by merchants.

20.  First Data enters supply agreements with manufacturer-suppliers of POS terminals and equipment that it then leases to customers.  For example, XAC Automation

Corporation, headquartered in Taiwan, manufactures several models of POS terminals that First Data brands and leases.  First Data has supply agreements with XAC that contain benefits and warranties related to the equipment made by XAC which flow to First Data as the purchaser under the contracts.  First Data has similar supply agreements with all of its other manufacturer-suppliers as well.  First Data does not share these supply agreements with its leasing customers nor inform customers of their existence.

21.     First Data is also a payment processor and has arrangements with literally hundreds of banks and independent sales organizations to sell processing services to customers.  For example, First Data is 40% owner of Well Fargo Merchant Services – one of the nation's largest sellers of processing services – and handles all processing for its customers.  Likewise, First Data is 40% owner of PNC Merchant Services – also a top provider of card processing – and handles all back-office processing for its customers.  First Data's list of such relationships would extend for hundreds of pages.  For purposes of this Class Action Complaint, the important point is that First Data is by no means a POS financing specialist.  Quite the contrary, POS equipment sales and leasing is an off-shoot – granted an incredibly profitable one – of First Data's main business.

22.     Customers sign up for a First Data POS terminal lease as part of a new card processing relationship.  In fact, Defendant includes in its form contracts utilized by all of its allied sales agents that it does not have any obligation to make leased equipment compatible for use with any other processor.  The First Data agent (such as a sales agent of Well Fargo Merchant Services) provides the initial documents to merchants and facilitates the start of the agreement among the merchant and all other players in the scheme.  These form documents may

include a "Merchant Processing Application," "Program Guide," and "Equipment Lease Agreement."

23.     Merchants are initially presented a Merchant Processing Application, which is subject to the processor and member bank's approval.  This Application requires the merchant to provide general information about their business, in addition to the business's checking account number and routing number for automatic billing purposes.

24.     The dense legal terms at the end of this Merchant Application provide the merchant "will be bound by all provisions set forth in the Program Guide as it may be amended from time to time . . . ."

25.     The Program Guide, as it is may be amended from time to time, is a massive (50 to 60-page) document with dense text throughout.  Merchants generally do not receive the Program Guide but they are required to sign a confirmation page saying that they have. Throughout the Program Guide, Defendant and other players in the scheme use misleading terms and identifiers so that merchants are bound to agreements with multiple parties, including First Data.

26.     Although the Program Guide identifies itself as a "service agreement" and disclaims all possible warranties, the Program Guide also includes a section of "Terms of Equipment Purchase or Rental" deep inside the lengthy form document.  These terms apply to any equipment the merchant leases during its relationship with the payment processor.  The first paragraph of these terms claims that "sales and rentals are made by Processor."  Shortly below this claim is a clause indicating any warranties relating to equipment or software comes "from the applicable third party provider or manufacturer ('Vendor') . . . contained within the

packaging shipped from the Vendor."  The term "Vendor" is not defined nor used in this context anywhere else in the Program Guide.

27.    The Equipment Purchase or Rental section of the Program Guide requires the leased equipment to be returned to the processor/sales agent upon termination of the agreement and provides for payment to the processor should the merchant fail to do so.  It also grants the processor a security interest in all leased equipment during the life of the processing agreement. Finally, when a merchant terminates, the Terms of Equipment Purchase or Rental section purports to give the processor the right to accelerate "all monthly rental charges for the remainder of the applicable rental period."

28.    After filling out and signing the Merchant Services Application and other introductory documents with the payment processor, First Data takes over the POS equipment lease.  It pays the sales agent or organization usually a very substantial one-time payment for generating the lease.  For example, it is not unusual for the sales commission on one lease to exceed $1000.  That the commission far exceeds the cost of the equipment to First Data reveals the hugely profitable nature of FDGL's business.

29.    After signing up for payment processing services, including POS equipment, merchants receive a letter from Defendant First Data.  This is often the first time a merchant becomes aware they are doing business with First Data.

30.    This letter begins by referencing the Merchant Services Application provided to the merchant by First Data's agent.  It also notifies the merchant that monthly deductions will be made from the merchant's bank account which was listed on the Merchant Services Application. The letter states that the deductions will reference "FDGL" on the bank statement.

31.     The letter also claims merchants can find the same Terms and Conditions "in the equipment lease agreement section of the Program Guide" provided by the processor.  Many merchants also sign an Equipment Lease Agreement which identifies FDGL as the lessor of the equipment.  However, the Equipment Lease Agreement also states the "Equipment Agreement" provisions in the Program Guide govern equipment rentals.[1]

32.     The terms provided by Defendant conflict with the terms of the Program Guide's Terms of Equipment Purchase or Rental section.   For example, the Terms of Equipment Purchase or Rental section identifies the processor as responsible for leasing the equipment and states that merchants will be assessed fees for failing to return leased equipment to the processor at the end of the term.  But Defendant's terms indicate merchants are required to return the same equipment to First Data or pay Defendant for the value of the equipment.  Defendant also claims a security interest in the same leased equipment which is already subject to a security interest to another party in the Program Guide.

33.     After purportedly receiving lengthy fine print contracts from several parties, merchants are unaware of their countless and conflicting obligations, the company or companies to which they are obligated, and which company or companies are obligated to them.   For example, merchants have no way of knowing what company, if any, has provided a warranty on the equipment they have leased.

**B.      First Data Charges Monthly Fees for Equipment No Longer Leased**

34.     First Data's practice is to never stop automatic lease payment deductions unless equipment has been returned to First Data and logged into its returns system.

---

[1] Section 18 of the Program Guide is titled "Terms of Equipment Purchase or Rental."  The term "Equipment Agreement" does not actually appear.

10

35.     For example, Three Rivers leased two POS terminals from Defendant as part of a non-cancelable lease lasting longer than the equipment's usable life.  Well within the remaining lease term, a First Data representative called one of the Three Rivers owners to inform him that the leased POS terminals would not work anymore; and that Three Rivers would need new terminals.  Because the POS terminals were malfunctioning, Three Rivers was amenable to accepting replacement terminals.

36.     First Data elected to send Three Rivers two new POS terminals **and** at the same time locked Three Rivers into new non-cancelable lease agreements for a new four-year term.

37.     At the time First Data sent two new POS terminals to Three Rivers, a First Data representative instructed Three Rivers to return the unusable terminals to First Data.  Three Rivers followed First Data's instructions and mailed both terminals to First Data's warehouse in Melville, New York using shipping labels and packing slips provided by Defendant.  However, First Data's receiving system was faulty and resulted in the shipment being returned to Three Rivers.

38.     Three Rivers contacted First Data in its ongoing attempt to return the malfunctioning terminals.  First Data eventually instructed Three Rivers to keep both old terminals at no cost.  The terminals were past their useful life, and First Data had long since exponentially recouped their modest cost, so this was not surprising.  Three Rivers put both terminals in a closet for storage and did not make any further attempts to use them.  As noted above, Plaintiff believed the two new terminals were merely "replacements" for the malfunctioning terminals and that it had no further obligations regarding the malfunctioning terminals.

39.     Three Rivers began using the new POS terminals and First Data began charging monthly rental fees for the new terminals.  Three Rivers discovered months later, however, that First Data was continuing to charge monthly rental fees for the POS terminals that were no longer in use, even though Three Rivers had diligently attempted to return them and had been told that they did not need to be returned.  Plaintiff was being debited for four monthly lease charges in the total amount of $234.17.  First Data continued drawing these excessive amounts from Plaintiff's bank account for months, resulting in Three Rivers paying hundreds of dollars for nothing in that the two older terminals were not even being used.  Note that each POS terminal Plaintiff was provided cost less than $200 to purchase at retail and of course cost First Data far less.

40.     Each month, First Data automatically debits merchants' bank accounts for each leased POS terminal.  Charges are posted with long identification numbers and are mixed in with the other charges a merchant faces for credit card transactions.  For this reason, and because of the general press of business, Three Rivers did not notice the outrageous charges in the first months.

41.     It was not until Plaintiff conducted a specified search of bank account records that it discovered the improper charges.  One of the owners of Three Rivers called to complain but Defendant did not refund the improper charges.  This was the final straw that broke the proverbial camel's back and Plaintiff resolved to do whatever it took to get out of its business relationship with First Data.

42.     Even though First Data had affirmatively requested that Three Rivers not use the two initial terminals, and even told Plaintiff they did not need to be returned, FDGL did not stop charging monthly fees until Three Rivers both paid Defendant's demand for early termination

fees and returned the malfunctioning equipment that Three Rivers had previously been instructed to keep.

43.     Upon examination of the numerous charges First Data made to Three River's bank account, it has also discovered that two $35 overdraft fees were suffered only due to Defendant's continued withdrawal of monthly fees for the unusable POS terminals.

44.     First Data also charged $30.20 in "annual fees" for each of the unusable terminals – both incurred several months after Three Rivers attempted to return them to First Data.  First Data justifies these fees as a "20.00 charge for the reimbursement of the average property taxes assessed on your leased [POS] terminal" and a $10.20 fee, which is "the cost to process any taxes that are required."

45.     As shown below, First Data's conduct in regard to Three Rivers' efforts to terminate the leases for the two newer POS terminals was even more egregious.

## C.     First Data Charges Termination Fees in Excess of Those Agreed Upon or Allowed Under Applicable Law

46.     First Data includes a "non-cancelable agreement" clause within its form contract as well as its affiliates' Program Guide.  This clause is an attempt by First Data to maximize profit regardless of the circumstances.  In fact, First Data claims the contract cannot be canceled without the customer paying all remaining sums due for the full term of the lease agreement, even if First Data fails to perform its obligations under the contract.

47.     This contractual provision is known as a "hell or high water" clause.  Such provisions require that if a customer ends a lease agreement, all future rent payments under the terms of the lease must be made immediately.  In other words, "come hell or high water," the customer is obligated to pay in full.

48.     First Data mass produces or acquires the leased POS equipment in bulk, not solely for lease to a specific merchant.  First Data does not expend any additional resources or face any additional risks or obligations to acquire a POS terminal for a specific merchant.  First Data can sell or lease the POS terminals it manufactures or acquires in bulk to any other merchant seeking a POS terminal.  First Data often sells or re-leases POS terminals that merchants are required to return to First Data upon termination of a Lease Agreement.  Thus, First Data stands to profit substantially each time it enforces its termination clause against its customers.

49.     This Class Action Complaint does not challenge the lawfulness of the "hell or high water" clause but, at the very least, the terms of the "hell or high water" clause must be strictly adhered to.  Because First Data's policy is to violate the contractual term, it is in breach. First Data willfully miscalculates liquidated damages to overcharge customers upon termination. It is First Data's practice to charge unreasonable termination fees unsupported by any formula contained in lease agreements.  First Data provides no calculation of its claimed amounts due, yet makes threats of collection fees and other charges if its improperly-calculated liquidated damages are not promptly paid.

50.     This Class Action Complaint also challenges Defendant's use of its form contract "hell or high water" clause in conjunction with its failure to disclose third-party beneficiary rights.  In essence, First Data tries to "have its cake and eat it too" by seizing all of the benefits due a finance lessor while not complying with the requirements for such leases under the Uniform Commercial Code.

51.     The leases between First Data and Plaintiff included substantively identical relevant provisions to all of First Data's equipment leases.  Each provides that Defendant may exercise a demand for liquidated damages upon Plaintiff's default.  Termination prior to the end

14

of the lease is the same as default since First Data's leases are all non-cancelable.  Thus, First Data and its affiliates treat termination of a Lease Agreement before the end of its lengthy term as a default.

52.     The leases provide that, upon default, Defendant may either "(i) terminate this lease and [First Data's] future obligations under this Agreement, repossess the Equipment[,] and proceed in any lawful manner for collection of all charges *that have accrued* and are due and payable, **_or_** (ii) accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Equipment (as determined by us) . . . ."  (emphasis added).  First Data also claims the right to recover its costs and attorney's fees for collection.

53.     After Three Rivers discovered how it had been overcharged by First Data, it determined that it would no longer do business with Defendant.  One of the owners of Three Rivers called to notify First Data that it was terminating the two newer leases and was notified that First Data was charging termination fees of ***$1,699.70 each*** for the two terminals.  Plaintiff was also informed that the automatic debits for all four of the monthly lease payments would not cease until the termination fees were paid and the terminals had been received and logged in by First Data.

54.     Pursuant to the terms Defendant provided to Three Rivers, Plaintiff was to pay $45 a month for each newer terminal for a total period of 48 months.  A simple calculation showed that a total of only $1,575 was due for each POS terminal over the remaining 35 months of the leases.  Thus, First Data was assessing termination fees that exceeded the total amount owed on the lease.

55.     Defendant's practice is to charge customers excessive early termination fees, even beyond First Data's self-serving clause in its leases.  First Data provided no explanation of its calculation, but insisted payment of its demand was the only way for Three Rivers to avoid continuing monthly debits from its checking account.

56.     If Defendant contends the fees charged include applicable taxes – which would be improper for goods no longer leased – Defendant's termination fees are still excessive.  Plaintiff was charged $47.70 for one of the new terminals and $52.95 for the other.  It must be noted that both POS terminals were being used in the same jurisdiction, subject to the same applicable tax rate, if any.  Defendant's assessment of the same $1,699.70 termination fee for both POS terminals is illustrative of Defendant's common miscalculations.

57.     If Defendant contends the fees charged include a claim for fair market value of the formerly-leased equipment, then First Data breached the agreements by instructing Plaintiff to also return the equipment to Defendant, which Plaintiff did.  It is clear from Defendant's own form contracts that First Data has the option to either repossess the equipment _or_ require merchants to pay the fair market value.  First Data's practice is to defy the contract by doing both.  It does not stop automatically debiting monthly lease fees until a termination fee is paid and Defendant logs the terminal in as returned.

58.     While Defendant's breach of contract is clear to lawyers after reviewing the dozens of pages of legal fine print, it is not understood by customers who are left with no option but to pay the demanded termination fees.  Merchants face the certainty that First Data will continue withdrawing monthly POS terminal rental fees from their bank accounts unless they pay the termination fee and return the terminal.  Indeed, this is exactly what happened to Three

Rivers when – due to First Data's error – the two returned terminals were not logged in by Defendant.

59.     Defendant's practice of charging unreasonable and excessive fees is further shown by the experiences of the members of another class certified by this Court and by the thousands of merchant complaints that appear on many small business websites.  *E.g.*, *Madanat v. First Data Corp.*, 282 F.R.D. 306, No. 1:11-cv-00364-LDW-ARL (E.D.N.Y. 2012) (adopting report and recommendation certifying a class to challenge the same "Optional Liquidated Damages Clause" challenged herein).  The *Madanat* class was certified to pursue the claim that First Data's termination fees were improper.  Unlike Three Rivers, and so many others who have paid the termination fees, the class representative in *Madanat* did not pay the termination fee, so a class was not certified for purposes of seeking reimbursement.  In further legal wrangling after certification, the case was settled on an individual basis.  The terms of settlement are not public. It is clear, however, that the members of the *Madanat* class did not release any claims.

60.     As was shown in *Madanat*, First Data has been overcharging customers for termination fees for many years.  Pursuant to the applicable statute of limitations, this case challenges all such overcharges in the prior six years.  By enforcing both of two plainly alternative provisions in its form leases, First Data breached the leases and should be required to return all termination fees paid by merchants that also returned their leased equipment.  In the case of Three Rivers, this amount was $3,399.40 for the two newer terminals.  The exact amount that should be reimbursed for the two older terminals is not known.

61.     In the alternative, Defendant should be required to refund the value of the returned equipment to any customer which paid both accelerated rent and First Data's charge for the equipment's value.  First Data must not be allowed to "have its cake and eat it too."

17

62.     Further, and at the very least, Defendant must refund all termination fees which exceed even the full amount of remaining lease payments.  The total of these obviously excessive charges in the case of Three Rivers was at least $249.40.  The full amount of Defendant's overcharges for termination fees can be determined through discovery, with the help of experts if necessary.

**D.      First Data and Other Parties to the Scheme Create Non-Negotiable Contracts in an Attempt to Leave Merchants Without Promise Nor Recourse**

63.     What makes Defendant's practice of locking customers into non-cancelable agreements worse is that First Data and its numerous agents attempt to shield themselves from any liability for their failure to adequately perform.  The agents use contracts which provide that all warranties come from unidentified and undefined "Vendors."  But, Defendant uses its fine print form contracts to disclaim all possible warranties or liabilities resulting from its failure to adequately perform.  For example, Defendant provides that equipment is being leased to merchants "as is" and puts an irrevocable burden on merchants to make lease payments "despite dissatisfaction with the Equipment for any reason."

64.     Defendant uses these provisions in tandem with "non-cancelable agreement" clauses to maximize its profits without making any promises to merchants or suffering any consequences for providing low quality POS terminals.  This is well illustrated by Defendant's ongoing charges to Three Rivers even after it notified Plaintiff that the terminals were unusable.  First Data also charged termination fees even though the equipment was unusable through no fault of Plaintiff.

65.     Defendant refuses to negotiate the terms of its form contracts with merchants.  All of its form contracts contain a clause expressly rejecting any changes which a merchant might make to the form contract.

66.     Furthermore, Defendant fails to provide its customers with any information regarding the manufacturer-supplier of the leased equipment.  Defendant does not inform its leasing customers of any of the benefits or warranties the manufacturer-supplier provides in its supply contract with Defendant.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action on behalf of itself and all others similarly situated.

68.     The Class is preliminarily defined as follows:

All First Data customers in the United States that paid a termination fee or penalty in violation of their lease agreement or the applicable New York law in the six-year period prior to the filing of suit.

69.     Plaintiff reserves the right to modify or amend the definition of this proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.  For example, discovery may show it to be appropriate to certify an additional class or classes.

70.     Excluded from the Class are First Data, its parents, subsidiaries, affiliates, joint ventures, officers, and directors, any entity in which First Data has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

71.     The relevant time period for the Class is the number of years immediately preceding the date on which this Class Action Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.  It is likely the relevant period will begin in October 2011 based on the applicable New York law, which includes a six-year statute of limitations for breaches of contract.

72.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can meet all the applicable requirements of Federal Rule of Civil Procedure 23(a) and (b)(3) and can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

73.     **Numerosity.**  The members of the Class are so numerous that individual joinder of all the members is impracticable.  There are thousands of First Data customers that have been damaged by Defendant's wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiff, but may be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

74.     **Commonality and Predominance.**  Numerous common questions of law and fact exist as to the claims of Plaintiff and the other Class members.  Such questions include, but are not limited to:

        a.     Whether First Data has breached its contract with Plaintiff and the other Class members, via express terms and/or statutorily imposed duties;

        b.     Whether First Data has charged unwarranted and unlawful termination fees;

        c.     Whether First Data is liable to Plaintiff and the other Class members for imposing improper fees;

        d.     Whether First Data fails to provide customers with the terms, benefits, and warranties contained in its supply agreements with supplier-manufacturers;

e.     Whether certain of the lease terms violate public policy, lack mutuality, are procedurally and substantively unconscionable, and are otherwise void and unenforceable; and

f.     Whether First Data should be enjoined from engaging in any or all of the unfair practices complained of herein.

75.    Other questions of law and fact common to the Class include:

a.     The proper method or methods by which to measure damages; and

b.     The declaratory and/or injunctive relief to which the Class is entitled.

76.    **Typicality.** Plaintiff's claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.  Further, Plaintiff and the members of the Class were comparably injured through the uniform misconduct described above.  Defendant utilized form contracts containing the same relevant terms throughout the relevant period.

77.    **Adequacy of Representation.**  Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Class members; Plaintiff has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously.  Plaintiff paid improper termination fees and requests the return of all such improperly assessed fees (and/or that First Data cease its effort to collect such improper fees) just like all members of the Class.  Plaintiff was also denied performance of the duty which is statutorily-imposed upon First Data in all of its leases with members of the Class, which incorporate New York law.  Class members' interests will be fairly and adequately protected by Plaintiff and its counsel.

78.     **Declaratory and Injunctive Relief.**  First Data has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

79.     **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against First Data, thus rendering it impracticable for Class members to individually seek redress for First Data's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

## COUNT I

## BREACH OF CONTRACT – OVERCHARGE OF TERMINATION FEES OR LIQUIDATED DAMAGES

80.     Plaintiff realleges and incorporates by reference all paragraphs above as though fully set forth herein.

81.     The actions taken by First Data have materially violated the specific terms of its contracts with Plaintiff and the Class.  First Data is liable for the losses of Plaintiff and the Class that have resulted from its breaches of contract.

82.     First Data materially breached its contract with Plaintiff and members of the Class by assessing improper fees for termination.  First Data justifies its demands for accelerated rent payments based on a liquidated damages clause in the fine print of its form contract.  However, First Data does not follow its own formula when demanding these payments.

83.     First Data's leases allow Defendant to either "(i) terminate this lease and [First Data's] future obligations under this Agreement, repossess the Equipment[,] and proceed in any lawful manner for collection of all charges ***that have accrued*** and are due and payable, ***<u>or</u>*** (ii) accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Equipment (as determined by us) . . . ." (emphasis added).

84.     However, upon termination of Plaintiff's leases, Defendant charged what it claimed to be the accelerated lease charges ***<u>and</u>*** demanded possession of the equipment formerly leased by Plaintiff.  This is First Data's standard practice.

85.     Also, as discussed above, Defendant's calculation of liquidated damages was higher than could have been calculated by totaling the accelerated lease payments.

86.     First Data demanded and accepted payment from Three Rivers of $3,399.40 prior to allowing termination of the two newer leases.  Additional improper amounts were demanded for the older useless equipment.  First Data's demands violated the plain terms of the leases in at least two ways.  First, since First Data demanded the return of the leased equipment – even providing mailing labels to Plaintiff – it could not demand payment of the remaining amounts due under the lease.  All it could do was require payment of any past due amounts and, since all such payments had been automatically deducted from Three Rivers' accounts, there was no such amount due.  All fees paid to account for future lease payments must be returned to Plaintiff and

members of the Class who returned leased equipment to First Data.   Second, First Data's automated formula that determines the amount of the termination fee is programmed in error. Defendant demands amounts far in excess of what the contract allows.

87.     Plaintiff and the members of the Class have performed all, or substantially all, of the obligations imposed on them under the contract.   There is no legitimate defense for First Data's conduct.

88.     Plaintiff and members of the Class sustained damages as a result of First Data's direct breaches of contract.

## COUNT II

## UNLAWFUL PENALTIES FOR TERMINATION

89.     Plaintiff realleges and incorporates by reference all paragraphs above as though fully set forth herein.

90.     As shown above, Defendant has charged Plaintiff and other members of the Class substantial termination fees unrelated to the cost of past or future performance under the contract.

91.     Defendant's calculation of termination fees is greatly in excess of Defendant's harm.   Such charges are an unlawful penalty imposed by Defendant on Plaintiff and members of the Class.   Defendant's practice of charging accelerated rent payments and fair market value – if that is its justification for charging and accepting termination fees in excess of future rent payments – in addition to repossessing the equipment gives Defendant a windfall in violation of New York law.

92.     Pursuant to applicable New York law, an unlawful penalty may not be assessed and is due to be returned to the victim.   Under no circumstances could First Data have been

entitled to receive more than it would have under the remaining term of the lease, which is exactly what results from its practices regarding early termination.  First Data's imposition of termination fees based upon the liquidated damages clause contained within its form contract with Plaintiff and members of the Class leads to a triple recovery, a remedy that is excessive and disproportionate to the actual harm, if any, suffered by First Data as a result of a merchant's early termination of a lease agreement.

93.     First Data's imposition of termination fees is based on a contractual clause giving Defendant the option to disregard a liquidated sum and sue for actual damages.  Such provisions, which allow Defendant to "have its cake and eat it too" are invalid and unenforceable under New York law.

94.     Plaintiff and members of the Class have sustained damages as a result of Defendant's unlawful imposition of penalties for contract termination.  All such amounts should be returned to Plaintiff and the members of the Class.  In Plaintiff's case, this totals in excess of $3,399.40.  Because Defendant is required by law to return unlawful penalties and its imposition of termination fees against Plaintiff and the Class is based upon an unlawful termination clause, damages owed to the Class can be determined through discovery of Defendant's records, perhaps with the help of an expert.

95.     Further, the Court should declare First Data's continued assessment of improper termination fees unlawful under New York law and order that it cease its efforts to collect such amounts.  First Data should be enjoined from charging excessive early termination fees and demanding payment of such fees through the threat of legal action and added damages.

## COUNT III

### BREACH OF CONTRACT – FAILING TO PERFORM
### STATUTORILY-IMPOSED DUTIES

96.     Plaintiff realleges and incorporates by reference all paragraphs above as though fully set forth herein.

97.     All of First Data's leases are – in accordance with Defendant's form contractual language – subject to the Uniform Commercial Code as adopted by the State of New York (NYUCC).  Article 2-A of the NYUCC "applies to any transaction, regardless of form, that creates a lease."

98.     Defendant treats its leases as "finance leases" under the NYUCC and avails itself of the statutory benefits granted to lessors in a finance lease.  That Defendant contemplates that the leases are finance agreements is evidenced by fine print language contained in its form contracts that gives First Data a self-executing first lien security interest in any leased equipment, should a court determine the contract is not a finance lease.  However, Defendant willfully neglects to perform duties required of a finance lessor by Article 2-A of the NYUCC.

99.     Defendant avails itself of a "hell or high water" clause in its agreements with customers.  As described above, the "hell or high water" clause is a provision requiring lessees to pay all rent payments due for the full lease term, regardless of a lessor's breach.

100.     Sub-section 2-A-103(g) of the NYUCC defines a finance lease as a three-party transaction in which the lessor plays a limited role.  Under this statutory definition, the lessor merely purchases specific equipment from a third-party supplier for the sole purpose of leasing the equipment to a specific lessee.  The lessor does not "select, manufacture, or supply the goods" and only acquires the goods for purposes of a specific lessee. This sub-section goes on to require the lessor to provide a prospective lessee with information about the lessor's contract

with the third-party supplier and gives the lessee the same rights and warranties given by the supplier to the lessor.

101.    The policy behind the NYUCC's approval of "hell or high water" provisions in finance leases rests on the premise that a lessor in a true finance lease has no interest in the transaction other than providing funding upfront and receiving bargained for rent payments. Therefore, courts may find it proper to separate the rent payment obligation from others contained in a true finance lease agreement.

102.    It is also reasoned that lessees in finance leases are not left without recourse because they receive all rights and promises given by the supplier to the lessor and may sue to enforce their contractual rights.  Before signing a finance lease, it is intended the lessee will:

     a.      Receive a copy of the agreement between the lessor and supplier;

     b.      Approve the contract between the lessor and the supplier;

     c.      Receive an "accurate and complete statement" of material terms within the agreement between lessor and supplier; and/or

     d.      Be notified by the lessor of the supplier's identity, the lessee's entitlement to promises and warranties in the lessor/supplier contract, and that the lessee has the right to communicate with the supplier.

103.    The NYUCC also contains a self-executing provision in all finance leases providing third-party beneficiary rights to lessees.  Under § 2-A-209 of the NYUCC, lessees in a finance agreement are automatically afforded all the promises and warranties the lessor receives from a supplier.  This self-executing provision may not be contracted around, despite Defendant's best efforts.

104.    In fact, the NYUCC clearly contemplates the importance and absolute duty created by this provision.  Lessors and suppliers are statutorily prohibited from modifying the promises and warranties in the supply contract if the supplier knows of the lease agreements.  Moreover, should the warranties and promises in a contract between a lessor and supplier be rescinded, the burden is placed on the lessor to provide the original benefits and warranties to the lessee.  This is the only way to justify a lessee's bargained for exchange of an irrevocable promise to make rent payments.

105.    First Data is in breach of contract for failing to perform self-executing duties imposed in all finance leases by the NYUCC.  First Data has not provided supply contracts to Plaintiff or members of the Class.  First Data has also failed to provide leasing customers with the benefits and warranties First Data receives from its suppliers with regard to the leased POS terminals.

106.    The consequences merchants suffer from First Data's practices and breach are severe.  Merchants lose warranties of merchantability, fitness for a particular purpose, and warranties against encumbrances.  Merchants face harsh risk of loss obligations throughout the transaction.  Merchants lose the ability to reject goods should First Data breach the contract.  First Data denies Plaintiff and members of the Class the rights to which they are statutorily entitled and that are given to them to enforce their benefit of the bargain.  Plaintiff's experience is illustrative because it was forced to pay monthly lease payments even for non-working terminals.  It was not afforded any of the rights which would be expected for a lessee under a finance lease, such as a warranty.

107.    Such injuries are a substantial loss of the benefit of the bargain for lessees who are locked into non-cancelable equipment leases.  Plaintiff and the members of the Class have

performed all, or substantially all, of the obligations imposed on them under the contract.  There is no legitimate defense for First Data's conduct.

108.    Thus, First Data was and is – as a matter of New York law – in breach of each lease agreement that it enters.  Such breach is willful, material, and detrimental to all customers. Because Defendant has breached its statutorily-required obligations it cannot obtain any of the termination penalties and charges described herein.

109.    Plaintiff and members of the Class sustained damages as a result of First Data's direct breaches of contract by failing to perform statutorily imposed duties.  These duties are material to all finance lease agreements because third-party beneficiary rights are a lessee's only source of warranty or enforcement of the benefit of the bargain.  Damages will be further proved upon examination through discovery of Defendant's supply agreements with all suppliers of equipment leased to Plaintiff and members of the Class during the relevant period.

## COUNT IV

## UNJUST ENRICHMENT

110.    Plaintiff realleges and incorporates by reference all paragraphs above as though fully set forth herein.

111.    This count is brought only in the alternative to Plaintiff's claims for direct breach of contract, breach of statutorily imposed contractual duties, and recovery of unlawful termination fees.  Indeed, if the contract is found to be void or unenforceable, Defendant must not be allowed to keep its ill-gotten gains.

112.    As alleged herein, Defendant was unjustly enriched at the expense of Plaintiff and the other members of the Class, which were grossly and inequitably overcharged.

113.    Plaintiff and the other members of the Class were unjustly deprived of money obtained by Defendant as a result of the improper and excessive fees that Defendant demanded and collected from Plaintiff and the other Class members.

114.    It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation obtained from Plaintiff and the other members of the Class as a result of its wrongful conduct alleged in this Class Action Complaint.

115.    Plaintiff and the other Class members are entitled to seek and do seek restitution from First Data as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the members of the Class demand a jury trial on all claims so triable and judgment as follows:

1.  Certifying this case as a class action pursuant to Federal Rule 23;

2.  Granting declaratory and injunctive relief as set forth herein;

3.  Awarding damages in an amount to be determined by a jury;

4.  Awarding pre-judgment interest at the maximum rate permitted;

5.  Compelling disgorgement of the ill-gotten gain derived by Defendant from its misconduct;

6.  Awarding all reasonable costs incurred by Plaintiff and the Class in connection with this action, including reasonable legal fees pursuant to applicable law; and

7.  Awarding such other relief as this Court deems just and proper.

Dated: October 13, 2017 Respectfully submitted,

          WEBB, KLASE & LEMOND, LLC

By: */s/ E. Adam Webb*
   E. Adam Webb*

   1900 The Exchange, S.E.
   Suite 480
   Atlanta, Georgia 30339
   (770) 444-0773
   Adam@WebbLLC.com

   *Attorneys for Plaintiff*

   * Motion for *Pro Hac Vice* Admission to be filed
   after case number assigned